May it please the court, Tanya Morrow from the Federal Defender's Office representing Mr. Henry Villa. Mr. Villa did not receive a fair trial in this case. There were two main sets of reasons for that. The first was that the government deliberately misled Mr. Villa, as well as the court at times, about the nature of its case. The second reason that it was unfair was because the government and the court prevented Mr. Villa from developing and presenting evidence supporting his defense. There are at least five examples of the government's attempts to mislead Mr. Villa and the court. It first stated through the discovery litigation that it would provide Giglio evidence as soon as it became available, and yet it did not provide that evidence in the case of Ms. Hammett's statement, September's statement, in which it was indicated that she had made a false statement, made false statements at grand jury, and the government had provided her immunity from that perjury as well as her role in the marijuana conspiracy itself. They did not provide that information until after or at the time that Ms. Hammett took the stand. Wait a minute. The grand jury transcript showed that she had told one story before going to the grand jury and a different one at the grand jury, right? No. Her interrogation statement was consistent with what she said at the grand jury, that she had no knowledge about what was going on. She really did have some knowledge, and that's why they gave her immunity. In September, two months before trial, she made a contrary statement. But didn't they give you the – did you try the case? I did. Didn't they give you the contradictory statement by Hammett before she took the stand? They gave it to us as she was taking the stand. As she was taking the stand. All right. Now, was – did you have a chance to cross-examine her on her inconsistent statements? I did have some opportunity to cross-examine Your Honor, but the records will show also that that effort was severely limited by the court due to the government's misstatement and overstatement of the security issue to Ms. Hammett in particular. And I can go through that. I'd like to turn to that now. All right. Just to back up for a moment, I want to make sure I understand what specific issues you're arguing here. Are you indicating that the government provision of the documents to you was not in compliance with the Jenks Act? Because their argument is they complied with the Jenks Act and gave it to you at the time required under that statute. I'm arguing that as well. The first argument is that they told the court that they would provide exculpatory evidence as soon as it became available, and they did not do that. Are you saying there was prosecutorial misconduct? Is that what you're claiming? We are saying, Your Honor, that the government purposely misled the defense, and in some instances the court in this case, which prejudiced Mr. Villa's ability to have an appropriate opening statement, his ability to appropriately cross-examine the witnesses. It also prejudiced his ability to make a closing statement. And I can point to that. When you say misled, you mean as to the timing of the disclosure? Yes. Essentially misled Mr. Villa as to the nature of its case prior to it beginning, which prejudiced his ability to address it. But all you've relayed so far has to do strictly with timing. They didn't really actually withhold any evidence, right? They did not withhold any evidence. In the end. That's correct, Your Honor. It did not withhold evidence. So it all has to do with timing. It had to do with timing. So in the timing argument, our analysis, doesn't it really go to prejudice? Exactly. Yes. I'm not making the claim that we did not get the evidence. You said that the delay in giving Ms. Hammett's contradictory statement to you interfered with your making an opening statement? Yes, it did, Your Honor. We were not able to. You didn't make an opening statement until the beginning of your case, did you? By not knowing that the government that ---- Wait a minute. I'm sorry. She's called by the prosecution. Before she gets on the stand, they give you information that shows that she made a contradictory statement. You haven't made an opening statement yet, have you? Yes, I have. Oh, you made an opening statement immediately after the prosecution did? Yes, Your Honor. That was your choice. Yes, based on the information that we had. But your point is that choice was partly based upon not knowing about this impeaching statement. Yes. It prejudiced our ability to point to the jury that yet another witness on the government's witness list that they were going to be testifying was also granted immunity, had lied at the grand jury. But wouldn't that be true in every Jenks Act case, I guess, if the defense went ahead and did an opening statement after the government? And then pursuant to the Jenks Act, there's no requirement on the government to provide the material until after the witness takes the stand. That's correct, Judge Ikuda. The issue here, though, is it's exculpatory. And there's a reason that the Constitution requires the government to provide prior notice. It's a due process notice right to know when the government is going to present a witness that has previously testified at the grand jury in this case that lied and that they had provided immunity from that perjury as well as participation in the offense. That information is key, and the Constitution requires that it be given before trial. Are you relying on our Brady jurisprudence? Yes, I am. Because we have in Alvarez, we said that where there's a conflict between the Brady requirements and the Jenks Act, and we follow the Jenks Act, and that would be controlling. In this case, that is not what the government argued. Neither did the government seek the court's approval for that, withholding of that disclosure. In fact, the government had indicated it would give the information prior to trial, and it actually advised the court that it was not seeking to withhold any exculpatory information when it provided its notice of Jenks material to the judge. Now, the court may have had authority to allow a late tendering of the information, but that's not what happened in this case. By the way, I just thought of, out of my curiosity, in this district, is it customary or common for the government to provide Jenks material? Yes, it is. As the witness takes the stand? No, prior to trial. Prior to trial. And, in fact, the court had an order in this case that was consistent with that practice prior to trial. So the question we get back to is not Jenks Act versus Brady Act. It's that the prosecutor said one thing. It's that prosecutorial misconduct question. And so I guess if that's really the gist of your argument, then we would have to say that that prejudiced your client, right? And we've made the argument that it has. And you're arguing it did because of the opening statement. Because of the opening, because of the limitations on the cross-examination. Well, was that due to the limitations on the cross-examination due to the timing of the disclosure, or was it the district court's ruling on other 403 grounds? It was partly both. We had attempted to cross-examine her on some financial bias that we were marginally aware of, and the court kept us on a very extremely short leash with all of that. In fact, it prevented me from asking some key questions regarding that financial obligation, those financial issues. If the court will review the record at ER 631 through 632, the court ruled that Mr. Villa's the information concerning Mr. Villa's failure to maintain the mortgage payments on that property just a few months before trial was not we were not able to cross-examine her on those issues. But you did cross-examine her on her motivation to lie, as I read the transcript, based on her immunity deal with the government. Is that right? We were able to establish that she was given immunity. However, when we came to closing, the government actually objected when I argued to the jury that she had received immunity. The government objected at page 708 to 709 in the record, and the court sustained the objection. In fact, as well, the court prevented us from including her in the accomplice instruction. The court said I made my exception. And so as a result of the government's failure to timely disclose, as well as overstatement of the security issue to Ms. Hammett, and the record reflects that the government told Judge Panner that Mr. Villa had threatened to kill Ms. Hammett. Her trial testimony did not support that. There was an overstatement of that issue, and that wasn't revealed to the district court and to Judge Panner until her cross-examination, after which, you know, before which he severely limited our cross-examination opportunity. But then at sentencing, didn't he find under the sentencing standard? He did. So ultimately he rejected our evidence at sentencing with regard to that. I believe the factual finding is not supported by the record, and we did argue that. The other thing I'd like to touch upon, I would like to reserve some time, but is that Mr. Villa's attempt to obtain information concerning the gang affiliations of the defendants, I mean the co-defendants and the unindicted co-defendants, he I think unequivocally described for the court what the basis for his interest in that evidence was, the discovery supported the theory, he indicated that the government's main witness had two criminal convictions for distribution or manufacturing. He indicated that his own, he proffered his own evidence that at least that his two nephews, who he believed had these ties to these gang members that were found in the grove, also had criminal convictions and or contacts with law enforcement concerning drug distribution and or possession. And he also ultimately got the city of Merced to say in the hearing that the materials that he sought included gang affiliation information as well as an investigation concerning a murder. And that's in the record, in the supplemental record at ER 30-31. So all that information was before the Judge Panner, before he denied the motion to ---- What was the basis of Judge Panner's denial? This is a, you asked for a subpoena, right? I asked for a subpoena. And that's how this came up? That's how it came up. Okay. And what was Judge Panner's reason? It's a little ambiguous, but he said specificity and reading the record, it is clear that that was the government as well as the city of Merced's position that it was a fishing expedition, that we did not have enough information to specify what exactly we were looking for. And yet it was clear that we were looking for at least three things, one of which was affiliations with gangs, and the city of Merced at the hearing indicated that the materials covered included that. I mean, the request was for, as I read it, was for 20, whatever you have, 14 individuals over a period of some 20 years. I think it was about seven individuals, and I believe it was limited to about 15 years, and the reason for that was because that's the period of time under the federal sentencing guidelines that we count criminal history. And then didn't the magistrate judge say if you came up with something that was more narrow, he would consider it, and then the record did not indicate that? That's not what he said. He said it was not specified again, which, again, indicates he believed it was a fishing expedition and that it went beyond criminal history or it asked for improper impeachment evidence. And did you submit a more narrowly tailored? I did not, and as we've indicated in our reply, we could not. We needed the city of Merced to assist us in telling us what exactly it had, other than just the general indication that it had, gang-related affiliation, and the city of Merced was unable to do that according to its statutory rules. It believed it had a privacy. Did it have any rap sheets? I didn't need those, Your Honor. I had some of that. What I needed was the information in their files. Rap sheets and police reports, I mean, rap sheets don't indicate whether there's a gang affiliation. You've got to get beyond that, not the ones we had, based on our own investigation. You've got to get beyond that and get to the police reports in order to discover that. And we tendered something into the record. It was in sentencing, and we mentioned it to the judge. When I attempted to get the state, the government's key witness, Bunn, to state whether he was affiliated with the Oriental Troops, we had indicated to the court, and it's in the record, that there was a police report in which he was a passenger in a vehicle which his brother-in-law was driving, and his brother-in-law was an admitted member of the Oriental Troops gang, and it was in the police report. That evidence was also excluded. Let me get back to this subpoena business now. First of all, when you appeal the quashing, do you have to show prejudice like in any other kind of issue you appeal? In other words, that the quashing of the subpoena prejudiced your case? Do you have to show that? Your Honor, we're taking the position that it's a violation of a right to compulsory process and his right to a fair trial and right to present a defense. So structural error. Structural error. So you think you don't have to show prejudice? No. Well, let me ask you a little bit differently now. All this happened before the magistrate, several months before trial, right? Yes. And did you do anything during the intervening, whatever, however many months it is to sort of cure this problem? I couldn't imagine, Your Honor, how we could find out about gang affiliations other than official documentation at the police level. Did you get an investigator down there? We did, and she hadn't asked. One of the witnesses indicated that he was not involved. This was Frank. We had contacted him. Your Honor, I don't believe that anybody's going to answer the question truthfully that they're a member of a gang. It's going to have to come from intelligence at the street level with police officers. Maybe, you know, the investigator could see some tattoos or something like that. Well, that's true. You never know. All right. Use up your time. Thank you. Thank you. Thank you very much. We'll hear from the government. Good morning. May it please the Court. Kelly Zusman appearing on behalf of the United States. I'd like to begin with the issue that you left with on the subpoena to the city of Merced. There were two orders in this case. The first came from Judge Clark, the magistrate judge, and this is at page 7 of his order. The basis for his ruling is, and I'll quote from his opinion, the court cannot tell if the requested material meets the requirements of Rule 17C. The court finds that the subpoena in its present form is unreasonable and oppressive and is therefore quashed. Just based on broadness? Correct. And because the application was submitted ex parte and under seal, the government was never given access to that. So the basis for our objection is also on scope and specificity. Judge Panner, the decision was appealed to Judge Panner. Judge Panner also ruled on the basis of specificity. He says the subpoena as drafted is overbroad and goes beyond requesting criminal history. So, therefore, I believe both Judge Clark and Judge Panner returned this issue to the defense to narrow the subpoena. The city of Merced had objected on the basis that it would require them to produce voluminous documentation and it would pose an unreasonable burden on the city. And so that's really what was at issue, and it was simply a turn back to say, look, 15 years, six individuals, and you want any reference to them at all. And that's simply too broad, and it was never narrowed further. Because of that, I don't believe that either Judge Panner or Judge Clark abused their discretion in rejecting the defendant's request to the city of Merced in quashing that subpoena. I'd like to turn next to the first point that Ms. Morrow made, which is why didn't you turn over the contradictory statements by Hemet until she took the stand? Right. And I'd like to answer that by first off taking on the notion that there was prosecutorial misconduct in this case. What actually happened was in February of 2008, Ms. Hemet testified before the grand jury, providing basically largely exculpatory information to the extent that she was working two jobs, she doesn't remember much of anything, and she certainly had nothing inculpatory as to Mr. Villa at that time. Two months before the trial, she came to us and said, I can't live with this anymore, I'm terrified of the defendant, but I have to tell the truth. She proffered with us two months before trial. That was memorialized in a report by Agent Wright that appears in the record at ER 146. Agent Wright described what she told us and described the fact that she was terrified. She was crying throughout the interview. So what we did was we took that information to Judge Panner two and a half weeks before trial. We gave Judge Panner a copy of the report, and we said, we would like the court's permission to not disclose this until the time of trial. Mr. Villa is on release. We have a witness who is terrified of him. Now, regardless of if they were engaged in a domestic relationship prior to the time of the arrest here, regardless of whether or not she's telling the truth or she's not telling the truth, clearly she was upset, and we wanted to take steps to protect her. So we gave it to Judge Panner, and we said, Judge Panner, here it is, we don't want to have to disclose, we realize we have to disclose this, but in order to protect her, we want to delay disclosure until the time of trial. And Judge Panner granted that request. Now, in terms of whether or not there was any prejudice to the defense, you have in this record the trial judge's post-trial opinion that there was no prejudice, that when Ms. Hammett was called to the stand, Ms. Morrow did stand up, and she said, I need more time to prepare in light of what I have received today. Judge Panner said, fine, we'll recess until tomorrow. And the response was, thank you, Your Honor. At no point did anyone ever stand up and say to Judge Panner, we need even more time, we need a week, or we need ---- Kennedy, with respect to what counsel said, that the failure to have the contradictory testimony in time to make an opening statement, did the defense move the trial judge's testimony to allow a reopening of opening statement to make a further opening statement as to proof it would be of use? No. And the other thing about the opening statement is if you read through the defense opening statement, they actually don't touch Ms. Hammett's grand jury testimony. And I think in large part, she was an ex-girlfriend. I think everyone was a little uncertain as to exactly what she would say at the time of trial. But in light of all of that, I think Judge Panner appropriately balanced both the witness's concerns against the defendant's need for the information, and he decided that witness security concerns were paramount. And I think that decision is entitled to deference. And ultimately, she did cross-examine Ms. Hammett about those contradictory statements. She also questioned her about the immunity agreement. I would like to correct one statement that Ms. Morrow made about the government objecting during her closing argument to referring to Ms. Hammett's immunity agreement. And the basis for that objection was not that Ms. Hammett had an immunity agreement. We didn't deny that. It was brought out during our opening and her cross. The objection was to the fact that the reference in Ms. Morrow's closing was, and I quote this is at ER 709, and Ms. Hammett, she's got an immunity for a perjury prosecution. And that was inaccurate. The immunity agreement, which appears at page 146 of the record, is actually an immunity from prosecution in this case and this investigation into the marijuana grow. So that was the basis for our objection, not that we were trying to hide from the jury that she had received immunity. There were a number of other issues raised with this appeal related to sentencing and the use of the GPS device. I'm prepared to answer the Court's questions on those points if there are questions. Could you address the use of the GPS device? We've now, we have a case, the D.C. Circuit has a case that's pending before the Supreme Court, which distinguishes not. Are we bound by Pineda-Moreno or is there room here to distinguish, do we have to go further on this? I didn't hear that opening argument. Are you still making that claim, the GPS? Oh, okay. And, Your Honor, I just checked this morning. There is a petition for cert pending on Maynard. It has not been granted yet to date. I don't believe. There's also a petition on Pineda, right? That's correct. They're both still pending. And, in fact, just last week, the Seventh Circuit issued a divided decision on the GPS question in a case called Cuevas. It was just issued last Thursday. You're pretty hopeful that the government's petition will be granted, aren't you? In Maynard, I mean. Yes. Don't you think? In fact, it's the Solicitor General that is petitioning for cert in that case. I believe that Pineda-Moreno answers the GPS question because it relies on knots and on caro, and we start with the assumption that the use of GPS to monitor one's movements on the public throwaways, there is no reasonable expectation of privacy. And because there is no- But Pineda doesn't address at all, you know, the duration of the monitoring. That's correct. And I think that's because duration was irrelevant to Pineda. In Pineda, in fact- The only one thing that's relevant to Pineda is the duration of the monitoring. And the only thing that's relevant to the appellant's argument here is the duration of the monitoring, right? Which Pineda doesn't address. So how can it be controlling if it doesn't address it? Because I think Pineda is broader than Maynard. I think- But it's all dictum, right? The broadness. But as I understand, persuasive dictum is controlling in the circuit. Well considered. Well considered. Whether it's persuasive or not, under the law of the circuit, we're bound. Right. And I think the- I agree with you. Certainly, Pineda Moreno does not address whether or not the fact that a GPS is- How long was the surveillance in Pineda? Pineda, we don't know. From the decision itself, we know that it was used seven times over the course of several months. But we don't know how long each time, at least not- Correct. Correct. Correct. And in the Seventh Circuit decision last week, they had 60 hours. And the court ultimately affirmed the denial of suppression in that case. If I can try to directly answer your question, it's the government's view that Pineda Moreno controls because Pineda Moreno, in turn, relied upon Knotts and Caro. And where you don't have a reasonable expectation of privacy in your movements on the public thoroughfare, then there is no Fourth Amendment interest that's implicated. Whether it's a day or a month or a year, the Fourth Amendment is never triggered. Wasn't there a footnote in Moreno, I think footnote two, saying-Pineda Moreno saying, True. True. And I'm not entirely sure what that footnote was designed to encompass. My answer, my shorter answer is that I think Pineda Moreno controls. To the extent we even look to Mainder, this case is clearly distinguishable    It's a very short time frame. It's a very short time frame. Mainder really addressed the notion that monitoring one's movements for an entire month reveals far more about an individual. For a week, particularly in this location, it did not reveal much. The only thing the GPS device was used for in this case was to locate what was a very remote marijuana grow site. So even if you were to look at the durational element, I think one week is clearly reasonable and would suffice to supplant what would otherwise have been conducted by visual surveillance. Unless there are further questions, I would submit. Thank you. Ms. Morrow, we'll give you an extra two minutes. Maybe you want to talk about your GPS search argument, which was seemingly absent in your opening statement. Oh, Your Honor, there's so many issues I wasn't able to get to that. But thank you. I appreciate the opportunity. Yeah, we've made essentially three arguments. That the warrant was necessary to install the device because it was in the curtilage. The judge, Judge Panard, denied that on a factual basis, finding that the driver... But that's obviously controlled by Canadian. That is controlled, but that is still an issue. We also argued that the warrant was necessary regarding all of the data because of the 24-hour surveillance and it was pursuant to the exception in Knott's and the fact that Pineda-Moreno had not reached that issue because it was not presented. And that is supported by footnote 2. We also made a third alternative argument that this case is also distinguished from Pineda-Moreno, even if the Court finds that it resolved the Knott's unanswered question, and that's because the government intended to use the information it received with regard to where Mr. Villa went on his own property. They did not just use this information to find the marijuana. When you say his own property, are you talking about the farm? Yes, the remote property. You can see the opening statement at 202, the closing statement at 690 to 691, the rebuttal at 738, 740, 741. The government refers to the fact that he went to his own property three times, at least three times in one week, and he must have known about the marijuana grow. This is all related and it should have been suppressed. I just quickly want to state that the Court did not grant the government's intent to say anything about the government's intent not to provide Jenks material. In fact, after the government gave its notice, the judge issued a written order, 186 ER 65, stating that the government shall furnish the defendant with any Jenks material prior to trial. And then lastly, the immunity the government provided Ms. Hammett included anything arising out of the investigation. Clearly, the investigation included the grand jury investigation, and so the comment about her having immunity from the perjury was an appropriate argument. Thank you. Thank you. All right. Thank you very much. The case of America vs. India will be submitted, and that will conclude our session for today and for the week. Thank you very much.
judges: Tashima, Bea, Ikuta